UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1-4:11CR288 RWS |
| | ) | |
| MARIO DARNELL SMITH and | ) | |
| JEFFREY G. WHITE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). The Defendant Mario Darnell Smith was charged by way of indictment on June 30, 2011. The Defendant filed motions to suppress, and an evidentiary hearing was held on the Defendant's motions on September 15, 2011. At the conclusion of the hearing, the undersigned ordered that any post-hearing briefs be filed no later than ten days after the filing of the transcript. Further, on October 6, 2011, the attorney for the United States filed a superseding indictment charging, in addition to Mario Darnell Smith, a second defendant, Jeffrey G. White. On October 14, 2011, the Defendants were arraigned on the superseding indictment, and directed to file any pretrial motions no later than October 25, 2011. Further, on October 21, 2011, the transcript of the evidentiary hearing held in September was filed in this matter. Subsequently, on November 4, 2011, Defendant Jeffrey G. White appeared on the record and knowingly waived his right to file pretrial motions and to hold a hearing on pretrial motions. Therefore, no report and recommendation as to Defendant White will be forthcoming.

Further, Defendant Smith filed his post-hearing brief on November 5, 2011, and the attorney for the United States filed a brief in response on November 16, 2011. Therefore, the following memorandum and order relates to Defendant Mario Darnell Smith.

Based upon the evidence adduced at the hearing on the motions to suppress, as well as a review of the transcript of the hearing in this matter, and the briefs of the parties, the undersigned makes the following findings of fact and conclusions of law:

### Findings of Fact

Brian Jackson is an FBI agent assigned to the cyber crime unit. He is the case agent in the fraud case involving Mario Smith. The case against Smith involves a fraud scheme in which US Bank and Ameren UE were the potential victims. In this matter, someone contacted US Bank via e-mail and telephone using the identity of a real Ameren UE executive who was authorized to do business with the bank and to withdraw money from the bank. This person requested that US Bank set up a cash vault delivery to a location specified by him. If things went according to the scheme, US Bank would deliver a large amount of cash to a location (in this case a rented office in Illinois) specified by the person impersonating the Ameren UE executive. Ameren UE and US Bank employees discovered the scheme while it was ongoing and contacted the FBI.

The person contacting the bank used two domain names that made them appear to be official Ameren UE Illinois sites. Although the domain names appeared to be business domain names of Ameren UE, in fact, they were not, and had the effect of falsely representing to the bank that the person contacting them was an official of Ameren UE. Eventually, in order to obtain the money, the person perpetrating this scheme needed to file, by e-mail, a cash vault questionnaire with US Bank.

Using metadata, the FBI was able to trace the user who last modified and originally created the cash vault questionnaire and sent it to US Bank. This person used the user name "bigdaddyallday."

Because the scheme was very unique, Agent Jackson talked to Lionel Myrthil, who was the bank crimes coordinator at the FBI in St. Louis. Myrthil told Jackson that a very similar scheme was perpetrated in Los Angeles, California, and that a person named Mario Smith was believed to be involved in that scheme. Myrthil was aware that Smith was now living in St. Louis, since Myrthil had investigated Smith for bank robberies and for illegally possessing a firearm. The Defendant was eventually convicted of being a felon in possession of a firearm. Myrthil interviewed the Defendant during this investigation. Myrthil also attended a court proceeding in which the Defendant attempted to recover $70,000 in cash that was seized from him during his arrest. Myrthil heard the Defendant speak at this proceeding. Myrthil also had a conversation with the Defendant a short time before the Ameren UE scheme when the Defendant attended a hearing in a case involving an armored car robbery. On this occasion, Myrthil talked to the Defendant in the hallway outside the courtroom and rode down the elevator with him. He also listened to an interview of the Defendant on a local television news broadcast. At least one of the contacts with the bank by the perpetrator of the scheme was by telephone. A bank employee on that occasion, at the request of the FBI, recorded the conversation between the bank employee and the person perpetrating the scheme. This conversation lasted several minutes. Myrthil listened to the conversation, and although Myrthil is not a voice expert, Myrthil believes that the Defendant is the person who was recorded by the bank employee.

Afer learning all this, Agent Jackson "Googled" "bigdaddyallday" and determined that "bigdaddyallday" is a YouTube channel. In checking the YouTube channel, Jackson found several photos of Mario Smith.

Almost all of the e-mails sent to Ameren UE about the scheme were sent from open access wireless connections at places such as Coffee Cartel, the public library, and McDonald's. However, one of the e-mails, which was part of the scheme, was sent from an unsecure wireless site located in a residence at 4506 Fair Avenue in St. Louis. The FBI determined that Smith's house is located directly across the street from the access point. Smith lives at 4507 Fair Avenue, and the person using the Wi-Fi at 4506 Fair was either located at that address or in very close proximity to that address, such as across the street. Based on these contacts through open access wireless computers at various locations and at all times of the day, the FBI believed that the perpetrator of the scheme, who they believed was Mario Smith, was using a laptop computer in order to execute the scheme. This is so because laptops are Wi-Fi equipped, and can create documents such as the bank vault questionnaire.

Based on the above, the agents, on June 20, 2011, conducted a surveillance of Smith. They were aware that he had a court date on that day in Madison County, Illinois. After first going to the wrong courthouse, the agents eventually found him at the Madison County Courthouse in Edwardsville, Illinois at about 10:30 a.m. Sometime around 11 a.m., the agents became aware that Smith or someone working with him had requested that $180,000 in cash be delivered to him at a third location. They decided they could not allow this scheme to go any further, and they would have to arrest Smith in order to defuse it. Agent Myrthil was the lead agent on the surveillance team when they arrested the Defendant. The agents and Myrthil picked up the surveillance of the Defendant

coming out of the courthouse in Illinois, and observed a person driving him to his house on Fair Avenue.  They observed the Defendant enter his house empty handed and leave carrying a computer bag.  He entered a car driven by a person they later learned to be Sahib Lewis.  The agents later learned that Lewis was on bond for bank robbery.  They observed the Defendant and Lewis drive to a Quizno's restaurant in downtown St. Louis, and decided to arrest the Defendant at the restaurant.  By the time the agents went into the restaurant, the Defendant and Lewis were seated at a table, and the Defendant had just left the table and was in the bathroom about twenty feet from the table.  The bag which appeared to contain a computer was sitting on the table in close proximity to Sahib Lewis.  As the Defendant exited the bathroom, he was arrested.   He was not cooperative, and would not place his hands where they could be seen, nor would he sit down.  The agents were aware that during his prior arrest for bank robbery, the Defendant fled from police and was in possession of a firearm.  After the Defendant was handcuffed, he told Lewis to take the computer bag at least twice.  Because the agents did not know if the computer bag contained some type of weapon and because it likely contained evidence in the form of a laptop computer, they seized the computer bag from Lewis's presence.  Although Lewis was detained at the time, he was not handcuffed, and was sitting very close to the computer bag and could have grabbed it.  Myrthil took possession of the bag, and as soon as Myrthil picked up the soft case, he was certain it contained a laptop computer.  This was significant to the agents because they believed that the Defendant had perpetrated the scheme, and that he had used a laptop computer to contact the bank as an integral part of his scheme.  The Defendant's person was also searched incident to his arrest, and three cellular telephones were seized from his person.

The Defendant was transported, along with the computer bag, to FBI headquarters. At the FBI office, Agent Brian Mize inventoried the contents of the computer bag. Agent Mize said he could tell by looking at the bag that a computer was contained in the bag. He briefly inventoried the bag by opening it. He observed the make and model of the computer without removing it from the computer bag, and, in fact, did not remove it. He did remove one cellular telephone which he also found in the bag, and went through some bank papers to make sure there were no valuables in the bank papers. This was done pursuant to the inventory policy of the FBI. First, the items were going to be booked with the Defendant, and kept at the FBI office. For the safety of everyone at the FBI, they needed to determine that the computer bag did not contain dangerous materials such as explosives, weapons, or sharp objects. They also needed to inventory the contents of the bag because of the possible liability to the FBI, and to make sure that they were aware of what they were keeping that may be eventually returned to the Defendant. They did this pursuant to FBI policy and according to the long practice of Mize as a police officer. They testified that this was for a legitimate inventory policy and not as a ruse to conduct a search.

Mize and Jackson were also involved in the interview of the Defendant. During the interview, the Defendant was advised of his rights per a Miranda form. The form was read to the Defendant in its entirety, and the Defendant stated he understood his rights, and agreed to waive his rights by talking to the agents. The Defendant was not threatened or promised anything during the interview. Although the Defendant appeared nervous, he was also coherent, and answered questions in a normal manner. He stated he was hungry and thirsty during the interview, and food and drink were provided to him. The Defendant, during this interview, admitted his involvement in the scheme, but would not go into any details.

After Agent Mize conducted the initial inventory of the computer and the cellular telephones, Agent Jackson attempted to preserve the evidence in the computer and the cell phones. He did this by initially placing the cell phones in a Faraday bag, which keeps them from receiving any outside signals that might be encoded into the phone to erase information from the phone. He eventually removed the cell phones from the Faraday bag, and placed them in the airplane mode so they could not receive any calls. He did this in order to preserve the battery life on the cellular telephones. Jackson, likewise, took the computer out of the case and plugged it in so it would not lose its power prior to being examined by a forensic examiner. He did this so the computer would not turn off and lock out the agents prior to a warrant being obtained so it could be examined. He also noted the make, model, and serial number of the computer and the cellular telephones. Other than this, the computer and the cell phones were not searched in any manner whatsoever. They were not searched because Jackson intended to obtain warrants to search each one of the items.

Jackson then went to the U.S. Attorney's Office where he obtained a complaint for the arrest of the Defendant for the fraud scheme, and a warrant to search the Defendant's house at 4507 Fair Avenue. That warrant was executed late in the afternoon on June 20, 2011. The next morning, Jackson prepared an affidavit to search the laptop computer as well as the four cellular telephones for any evidence of the illegal scheme. He also prepared a warrant to search the American Tourister computer bag seized from the Defendant, since a thorough search was not made of that bag, but only an inventory to determine whether anything of value or any weapons were in the bag.

The affidavit to search the computer bag contains all of the material stated above, of which the agents were aware prior to June 20, 2011, as well as the fact that prior to the seizure of the

American Tourister bag, the Defendant was very concerned that the agents not get control over the bag by telling Sahib Lewis on several occasions to take the bag.

**Conclusions of Law**

<u>I. Arrest of the Defendant</u>

Police officers may arrest persons without a warrant if they have probable cause to believe that the person committed a crime. <u>Beck v. State of Ohio</u>, 379 U.S. 89 (1964); <u>Gerstein v. Pugh</u> 420 U.S. 103 (1975). An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense. <u>See</u> <u>United States v. Torres-Lona</u>, 491 F.3d 750 (8th Cir. 2007). In this case, the undersigned must decide whether the above facts "viewed from the standpoint of an objectively reasonable officer" amount to probable cause. <u>Ornellas v. United States</u>, 517 U.S. 690 (1996). There need only be a "probability or substantial chance of criminal activity rather than an actual showing of criminal activity." <u>United States v. Mendoza</u>, 421 F.3d 663, 667 (8th Cir. 2005). Based on the above facts, the undersigned concludes that the agents possessed adequate probable cause to arrest the Defendant at the time he was taken into custody in the Quizno's Restaurant.

A. Shortly after the offense was reported, Agent Jackson asked Agent Myrthil (the bank crimes coordinator), if he was aware of similar-type schemes. Myrthil told him that a very similar scheme had been attempted in the recent past in Los Angeles, and that the suspect was Mario Smith, who was now living in St. Louis, Missouri.

B. The person perpetrating the scheme contacted the bank both by e-mail and telephone. As to the telephone call, the individual at the bank recorded his conversations with the suspect at the request of the FBI. One of the conversations lasted several minutes. Myrthil had investigated the

Defendant in the past, and talked to him on numerous occasions. In addition, he was able to listen to the Defendant in a television interview which was broadcast on local TV. When Myrthil listened to the calls recorded by the bank employee, he was confident that the caller sounded like he was Mario Smith.

C. On one occasion, the suspect sent a document via e-mail to the bank in which he used the user name "bigdaddyallday." When FBI agents conducted an internet search for the term "bigdaddyallday" using the Google search engine, they found a YouTube channel using that name. After viewing the pictures and videos on that channel, they determined that they were pictures and videos of Mario Smith.

D. As stated above, the correspondence with the bank was conducted either by e-mail or telephone. As to the e-mails, the FBI determined that the e-mails were sent from non-encrypted Wi-Fi points which were open to use by all individuals in the St. Louis area. These access points included McDonald's, Coffee Cartel, the public library, as well as a house located at 4506 Fair Avenue in St. Louis, Missouri. The undersigned concludes that the individual using the access point at 4506 Fair would have to be located in the house or at a very close proximity to the house. The FBI agents' investigation showed that Mr. Smith lived in a house directly across the street from 4506 Fair, at 4507 Fair.

E. Special Agent Jackson also concluded that because remote Wi-Fi access points, such as McDonald's, the public library, and Coffee Cartell were used, it was highly likely that the scheme was being perpetrated by use of a portable or laptop computer.

F. On the date of his arrest, Smith was observed carrying a bag suitable for the transportation of a laptop computer. Significantly, the bank had been contacted that day, and a $180,000 cash

transfer was requested by the suspect, who was then, of course, Mario Smith. The suspect needed to contact the bank on further occasions to finalize the delivery of the money. Therefore, the fact that Smith was observed to be carrying what appeared to be a laptop computer on this date, further enhanced the probable cause to arrest Smith.

Based on all of the above facts, the undersigned concludes there was sufficient probable cause to arrest Smith. The identification of the Defendant's voice, as well as the use of the "bigdaddyallday" username, was, in itself, sufficient for the agents to conclude that there was at least a "substantial chance" that the Defendant was involved in the scheme to defraud Ameren UE and the bank. See United States v. Mendoza, supra. The rest of the information (the wireless connection point, the carrying of the computer bag, and the information from the Los Angeles office), merely added to the already sufficient probable cause to arrest the Defendant. Therefore, the undersigned concludes that the Defendant was lawfully taken into custody.

II.  Seizure of the Shoulder Bag

Based on the above facts, the undersigned concludes that the seizure of the computer/shoulder bag was lawful. It was lawful on several grounds.

First, the bag could be seized as the product of a Terry stop and frisk of Sahib Lewis concurrent with the arrest of the Defendant. Law enforcement officers may detain a person if the officer has reasonable, articulable suspicion that a person is engaged in criminal activity. When an officer reasonably suspects that a person is involved in criminal activity, the officer may stop the person, question the person about his suspicions to confirm or deny them, and frisk the person for weapons. See Terry v. Ohio, 392 U.S. 1 (1968). The frisk may be conducted if the officer has a reasonable belief that the detainee poses a threat to the officer's safety or the safety of others. See,

Terry v. Ohio, supra. The frisk must be limited in scope, and must be a frisk for weapons. The frisk, however, does not have to be limited to the person's body, but also can be of bags or soft luggage that the detainee is carrying or to which he has access. See United States v. Atlas, 94 F.3d 447 (8th Cir. 1996); United States v. Thomson, 354 F.3d 1197 (10th Cir. 2003).

Further, if during the frisk, it is immediately apparent to the officer that the item he feels is contraband or evidence of a crime, the officer may seize the evidence from the person or the container. This is called the "plain touch" exception to the exclusionary rule and is closely related to the "plain view" doctrine. See Minnesota v. Dickerson, 508 U.S. 366 (1993); United States v. Grubczak, 793 F.2d 458 (2nd Cir. 1986). The undersigned concludes that the case now at bar presents an investigative stop and frisk for the protection of the agents and the public. The agents were aware that the Defendant was actively involved in swindling the bank, and, on a relatively recent prior occasion, had been arrested for bank robbery. On that occasion, the Defendant was in possession of $70,000 in cash and a loaded firearm. During the course of his arrest with the $70,000 and a loaded firearm, he fled from police and had to be chased by them in order for them to effect the arrest. Because of this arrest, he was eventually convicted in federal court of being a felon in possession of a firearm, and was on supervised release for that offense at the time of his arrest in the current matter. In addition, the agents were aware that the Defendant or his cohorts had made a request or demand on that day for $180,000 to be delivered by the bank to a remote location at the direction of the Defendant. They were further aware that the Defendant was in possession of a computer bag which appeared to contain a computer and also could have concealed a small weapon, such as a handgun. In addition, Sahib Lewis had driven the Defendant to his court appearance in Illinois, back to his home in Missouri to obtain his computer, and to the Qiuzno's in downtown St.

Louis. The agents concluded that a laptop computer, such as the one they believed the Defendant was carrying, would be necessary to complete the scheme, and Quizno's was the type of location from which the Defendant had previously contacted the bank pursuant to this scheme (Coffee Cartel, McDonald's, public library).

As stated above, they had probable cause to arrest the Defendant and, at that point, reasonable, articulable suspicion to detain Lewis to determine his role in the offense, if any. As it turned out, Lewis was also on bond for bank robbery. Further, as the Defendant was being handcuffed and Lewis detained, the Defendant told Lewis, twice, to take the bag. Under these circumstances, it was reasonable for the agents to conclude that both the Defendant and Lewis posed a threat to their safety and a threat to the safety of the customers in Quizno's. They were aware of the Defendant's history of carrying a gun, his history of fleeing from police, the fact that the computer case could conceal a weapon, the fact that the Defendant was in the midst of a scheme to swindle a bank out of a large amount of money, and they were aware that Lewis was chauffering him on this venture, and may have been involved with the Defendant. Given all of these circumstances, the undersigned concludes that there was probable cause to arrest the Defendant, and reasonable suspicion to detain Lewis, pat him down, and seize the soft bag which was sitting next to and within arms reach of Lewis. They could seize the bag both because it could have contained a weapon, and it likely contained evidence of a crime in the form of a laptop computer. After seizing the bag, it could be looked into for the protection of the agents.

In addition, the undersigned concludes that the bag, itself, as well as the computer were in plain view in the computer bag. The testimony at the hearing was that the agents firmly believed that the Defendant needed the computer to complete the crime, and that the computer case was suitable

for a laptop computer and likely contained a laptop computer. Picking up the computer case to feel it for a weapon was lawful under <u>Terry v. Ohio,</u> or the fact that it was in plain view. Picking up the computer case just confirmed what the agents had already observed--that there was a computer in the case.

In <u>United States v. Grubczak</u>, <u>supra</u>, agents seized lock-picking tools which were inside of a case during a search of the defendant's home. They justified the seizure on the basis that the lock-picking tools were in plain view, and their illegal nature was immediately apparent, even though they were inside of a case. In upholding this seizure and search, the Court stated as follows:

> Defendant's only claim here is that the incriminating nature of the lock-picking case was not immediately apparent. The predicate for this argument is that Agent Lewzader did more than just look at the case; he testified that he picked it up and shook it. Regardless of the applicability of the "plain feel" version of the plain view doctrine to the facts of this case, *see* <u>United States v. Ocampo</u>, 655 F.2d 421, 429 (2nd Cir. 1981), (approving "plain feel" concept where agents were able to discern currency through paper bag);. . . there is simply no merit to defendant's claim that the plain view doctrine here was misapplied. Indeed, defendant has mischaracterized the facts supporting a finding of plain view. While Agent Lewzader did pick up the case and undertake a tactile examination, his unequivocal testimony was that he had *concluded* that the case contained lock-picking tools *before* he picked it up. His additional survey served only to support his already formed conclusion as to the case's contents. That conclusion, predicated on his lengthy experience and his knowledge that defendant had been charged with burglary in the past, plainly supported his probable cause belief that the case was connected with criminal activity. . .

793 F.2d 458, 461.

Based on the above, the undersigned concludes that the American Tourister bag could be seized and its contents viewed both on the "plain view" and "plain feel" doctrine, as it was apparent under either doctrine that the case contained evidence of a crime in the form of a laptop computer. In <u>United States v. Ocampo</u>, 650 F.2d 421, 429 (2nd Cir. 1981), the agent was able to identify the contents of a bag as wrapped currency by feeling the outside of the bag. The Court concluded:

> Where the contents of a container are easily discernible by frisking the exterior of the package, there is little likelihood that the owner could reasonably expect any substantial degree of privacy. Under such circumstances it would be a pointless formality to require that the agents first obtain a warrant before examining the contents. Accordingly, we hold that the bag's contents could be examined under what amounts to a "plain feel" version of the "plain view" doctrine.

650 F.2d at 429.

Based on the above, the undersigned concludes that the bag and its contents were lawfully seized.

### III. The Evidence Received from Los Angeles

As stated above, a lead to the identity of Smith was received by Myrthil from the Los Angeles Office of the FBI. This evidence involved only the Defendant's identity, and that he was involved in a similar prior scheme in Los Angeles. Myrthil stated that he was generally aware that there was some problem with how the evidence was procured in Los Angeles. He was not aware of any specific details on this matter, and the case has, to this point, not been prosecuted. The only information passed on by Myrthil to Agent Watson was the Defendant's name and that the scheme was similar. It is undisputed that the scheme in Los Angeles was separate and distinct from the scheme in St. Louis, and that the scheme in St. Louis took place some time after the Los Angeles scheme. The Defendant alleges that the search in California was illegal, and that, therefore, his identity as a suspect came from an illegal search and, therefore, all the evidence obtained in this separate case should be suppressed. Although this prior Los Angeles matter has never been litigated, even if the undersigned were to assume that the search in Los Angeles was unlawful and the evidence obtained there was obtained illegally, the St. Louis evidence nevertheless does not constitute fruit of the poisonous tree, and should not be suppressed.

In <u>United States v. Watson</u>, 950 F.2d 505 (8th Cir. 1991), local law enforcement agents searched the defendant's house based on a warrant authorizing them to search for drugs. During this search, the agents seized bank statements unrelated to drug trafficking, and which the Court of Appeals determined they had no probable cause to seize. These bank statements revealed the defendant's use of an alias, and various banks through which the defendant committed violations of the Internal Revenue laws, including violating the currency transaction laws of the United States. The defendant moved to suppress these documents and any subsequent evidence obtained directly or indirectly from the use of the documents on the basis that any subsequent prosecution was predicated on illegal seizure of the bank statements, and the use of the defendant's alias names in the subsequent investigation. Although concluding that the documents containing the alias names had been illegally seized, the Court of Appeals nevertheless refused to suppress information developed by the use of the defendant's alias name and the bank statements. In doing so, the Court held that the IRS fully and independently investigated all the matters involved in the Internal Revenue violations, and that merely obtaining a person's name and alias based on allegedly illegal conduct did not taint the entire investigation, nor did it require suppression of the subsequently obtained material. In so holding, the Court stated as follows:

> The mere fact that information gained during an illegal search gives rise to a subsequent, separate investigation of an individual does not necessarily taint the later investigation. . . Furthermore, if the information merely facilitates or shortens the subsequent investigation, it does not taint the investigation's results. *United States v. Falley*, 49 F.2d 433, 440 (2nd Cir. 1973).

> The only information from Sergeant Loring's report that Agent Prine and the grand jury used in their investigation was Watson's name, the alias Douglas Ginter, and the names of certain banks. In all other respects, the investigation was completely separate and independent of the presumably illegal search and none of the materials that Agent Prine prepared for trial included evidence seized in the search.

Initially, we conclude that where a law enforcement officer merely recommends investigation of a particular individual based on suspicions arising serendipitously from an illegal search, the causal connection is sufficiently attenuated so as to purge the later investigation of any taint from the original illegality. A contrary conclusion would amount to granting the suspect "lifelong immunity from investigation and prosecution". . .In such situations, the societal cost of imposing the exclusionary rule outweighs any deterrent effect. Furthermore, we find no basis to distinguish between a suspect's name and a potential alias. In the investigation of criminal activity, an alias is part and parcel to the suspect's name. The grand jury's use of Watson's name and the alias Douglas Ginter, therefore, did not taint the investigation.

950 F.2d 505, 507, 508.

Given the above, the undersigned concludes there is no basis to suppress any of the evidence seized in this case based on the fact that Myrthil became aware of the Defendant's name from a possible illegal search in California. First, the investigation was ongoing, even before Jackson became aware of the Defendant's name. Next, Jackson's investigation was separate from and subsequent to the Los Angeles investigation, and almost totally independent of Smith's name. Further, because of the "bigdaddyallday" information in a YouTube channel containing Smith's picture, the undersigned concludes that Smith's identity would have been discovered independent of the information from Los Angeles. This is so because Jackson discovered the "bigdaddyallday" YouTube channel using information discovered from the bank and Ameren UE, and not from information from Los Angeles. Further, the YouTube channel contained video and still photographs of Smith. Given that Myrthil was well aware of Smith's identity from several other investigations which took place prior to the Los Angeles investigation, the undersigned concludes that Smith would have been identified as a suspect based solely on the "bigdaddyallday" information independent of anything that was obtained from California. Therefore, the Defendant must fail on this ground.

IV. Search of the Computer Case, Laptop Computer and Cell Phones

Based on the above, the undersigned concludes that the search of the computer case, and the discovery of the laptop computer and the cell phone in the case is lawful on several grounds. First, the evidence should not be suppressed because the record before the Court establishes that the agents were going to apply for a warrant to search the computer bag, cell phones, and the laptop, even though they seized the laptop in plain view and inventoried the bag and its contents, and had taken steps to preserve the integrity of what evidence might be found on the laptop and cell phones.

In United States v. Swope, 542 F.3d 609 (8th Cir. 2008), police observed evidence of a bank robbery during an illegal entry into the defendant's house. They did not seize any evidence, and instead applied for a warrant to search the house. In the affidavit attached to the warrant, the agents included probable cause that they had developed prior to the illegal entry as well as the information that they observed during the illegal entry to the house. The Court held that the illegally observed evidence could be lawfully seized pursuant to the subsequent warrant, because it was the product of an independent source, and would have been independently discovered. In so holding, the Court stated as follows:

> A warrant obtained after an illegal search is not an independent source if either of the following are true: "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, "and "if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray*, 498 U.S. at 542, 108 S.Ct. 2529. In other words, *Murray* asks the following two questions, both of which must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them.
>
> We therefore read the second prong to "signify affect in a *substantive* manner," . . . i.e., whether removing the tainted information also removes the basis for probable cause.

As such, we conclude that the proper test under *Murray's* first prong is whether the police would have applied for the warrant had they not made the prior illegal observations.

United States v. Swope, 542 F.3d 609, 613, 614, 615.

Based on the above law, the undersigned concludes that the agents would have applied for a warrant to search the bag even had they not opened the bag to confirm that it contained a computer and observed the cell phone in the bag. The best evidence of this is that the agents expeditiously pursued and obtained warrants to search almost everything in this case. Shortly after the arrest of the Defendant, the agents first obtained a warrant to search the Defendant's house. The agents testified that this was their first priority because they did not have control over whatever evidence might be found in the house, and wanted to secure this evidence so it would not be destroyed. Significantly, they did **not** search any of the contents of the cell phone or the laptop even though it is apparent that they believed they were lawfully in possession of all of the items. They believed this because they did not hide this information from the magistrate judge in the affidavit, and, in fact, told the magistrate judge the exact manner which the laptop and cell phones were seized. At the same time they sought a warrant to search both the laptop computer case in which the laptop was observed and the laptop itself. This corroborates their own testimony that they intended to obtain warrants to search the bag and its contents even if they had not observed the laptop and the cell phones. The agents' entire focus in following and arresting the Defendant was to find out what the Defendant was carrying in the bag. The evidence shows that the prime focus along with arresting the Defendant and stopping the scheme, was to find the laptop the Defendant was using to communicate with the bank. The undersigned concludes that the evidence shows that they were likely to apply for a warrant to search the bag even before they arrested the Defendant and seized the bag. Therefore, the

18

undersigned concludes that the first prong of *Murray*, is met; that is, that the agents would have applied for the warrants even had they not made possible prior illegal observations.

As to the second prong, the evidence shows that there was sufficient probable cause to search the bag, the cell phones, and the laptop absent any information included in the application for the warrants that emanated any possible illegal search.

In short, the undersigned concludes that the affidavits in this case support probable cause to search the computer bag, the laptop, and the cell phones, even after the possible tainted information has been redacted from the affidavits. The redacted affidavit contains in substance the following facts:

In late May, the FBI was advised by Ameren UE security personnel that someone had contacted US Bank pretending to act on behalf of Ameren in an attempt to obtain money from the Ameren UE account at US Bank. The person contacting US Bank had access to Ameren UE account information at US Bank and the name of the person who worked for Ameren, who had authorization to make withdrawals. Many of the contacts with US Bank were made by e-mail using accounts which had been set up to look like Ameren UE accounts intended to deceive US Bank into believing they were official Ameren UE e-mails. The person attempting to defraud the bank contacted the bank by e-mail using public internet access points in the St. Louis area, including a coffee shop and a public library. It also included a public access point located in a residence directly across the street from the Defendant's address. As part of the scheme, a person pretending to represent Ameren, requested bank services in which an armored car would be scheduled to obtain cash funds from an Ameren account at US Bank for a delivery to a location as directed by the Defendant. Further, the affidavit stated that the Defendant was currently on federal supervision for being a felon in possession of a

firearm, and also had a prior federal fraud conviction.  Further, on May 26, 2011, an e-mail message was sent to US Bank regarding cash vault services.  The message which purported to be from a legitimate Ameren employee, was sent from an Ameren-Ill.com web site.  This web site was fraudulent, and did not belong to Ameren.  The e-mail requested that cash vault services be opened, and that cash eventually be delivered at the direction of the person perpetrating the fraud.  The document properties associated with the above-noted cash vault services documents showed that they were last used or created by a person using the username "bigdaddyallday."  The affidavit states that "bigdaddyallday" is a YouTube channel for Smith, and that a viewing of the videos on that YouTube channel confirm that it is, in fact, the Defendant.  Further, on June 16, 2011, the agent learned from the FBI in Los Angeles that Lakes Entertainment was the victim of a similar scheme being set up through US Bank.  The web sites used in that scheme indicated that they came from Lakes-Entertainment.com, a web site that was similar to but not related to the real Lakes Entertainment web site.  The e-mail that requested cash vault services came from an open access point at a coffee shop in St. Louis.  Further, on June 13, 2011, US Bank was again contacted by the perpetrator of the scheme, and, at this time, an open access point at 4506 Fair Avenue (across the street from the Defendant) was used to contact the bank.  This open access point was verified by the FBI.  Further, on at least, one prior occasion, a call was recorded between the US Bank and the person perpetrating the fraud.  Myrthil who has had previous interactions with Smith listened to a recorded conversation, and believes that the caller is Smith.  During surveillance on June 20, 2011, members of the investigation team observed Smith entering his residence at 4507 Fair with nothing, and then observed Smith leaving the residence a few minutes later with a bag which appeared to be suitable for carrying a laptop computer.  The affidavit stated that these are the bags and the laptop which the FBI was

requesting permission to search. The affidavit also states that during the surveillance on June 11, 2011, Smith was observed entering a Quizno's, and that when he was arrested, he was "in possession of the bag and four cell phones." Smith was accompanied by an individual identified as Sahib Lewis. Smith told Lewis to take the computer bag. At this point, the bag and its contents were seized by the FBI.

For a search warrant to be valid, it must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found at the place to be searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967). The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . .

Brinegar v. United States, 338 U.S. 160, 175 (1949).

Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context--not readily or even usefully reduced to a neat set of legal rules." See Illinois v. Gates, 462 U.S. 213, 232 (1983). Further, probable cause in an affidavit "must be weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Illinois v. Gates, at 232. Probable cause may be based on the totality of the circumstances present. All that need be shown for probable cause to search is that there be a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched. See Illinois v. Gates, supra. It is also stated by the courts that often there is no direct evidence that drugs or other contraband or evidence, such as money, were stored at a particular location. Nevertheless,

Courts have upheld search warrants as based on probable cause on the basis of inferences involved from the facts and the cases. See United States v. Grossman, 400 F.3d 212 (4th Cir. 2005). In short, there need only be a "fair probability" or substantial chance that evidence of criminal activity may be found rather than any actual showing of criminal activity itself. United States v. Mendoza, 421 F.3d 663, 667 (8th Cir. 2005).

Based on the above, the undersigned concludes that the redacted affidavit states probable cause to search the bag, the computer, and the cell phones. From all of the facts, including tracing of the Defendant's YouTube channel to "bigdaddyallday," as well as the identification of his voice on the phone, the undersigned concludes that the Defendant was the perpetrator of the crime. Further, the fact that there were open wireless access points and the Defendant used at least two of these points (the Coffee Cartel, and the house across the street from his house), shows that a laptop wireless computer was likely used to commit the fraud. Therefore, when the agents observed the Defendant carrying what they reasonably believed to be a laptop computer, they had probable cause to search that case and the computer inside of it for evidence of a crime. Therefore, the undersigned concludes that the second prong of the test is met because there is sufficient probable cause to search the bag even after any information relating to the alleged illegal search is redacted.[1] There was also

---

[1] The undersigned also concludes that the inventory search testified to by Agent Mize was lawful. Inventory searches are conducted to protect police from claims of lost or stolen property and to protect the police from potential danger from items to be kept in police custody. Inventory searches that are conducted according to standard police policy are reasonable. Further, police may be on the lookout for incriminating evidence during the inventory search, as long as their sole purpose is not to investigate the crime but also has a legitimate inventory purpose. See United States v. Frasher, 632 F.3d 450 (8th Cir. 2011); United States v. Hall, 497 F.3d 846 (8th Cir. 2007). Smith complains that the inventory was a mere ruse to search for incriminating evidence. The evidence at the hearing showed that the search was conducted in conformity with standard FBI policy and that property could not be taken into custody without examining it to determine if it contained dangerous or toxic materials or other dangerous objects. Further, it was already known that the bag contained

probable cause to search the cell phones to determine if the Defendant used them to contact the bank and talk to an employee.

V. The Agents Securing and Preserving the Cell Phone and Laptop Computer Information

The undersigned concludes that there was nothing improper in Special Agent Jackson taking steps to ensure that there was no loss of electronic evidence either from the cellular telephones or the laptop computer pending search warrants being obtained on the next day. If exigent circumstances exist, officers need not wait for a warrant, if the exigent circumstances present a risk that evidence is about to be lost or destroyed. See United States v. Cisneros-Gutierrez, 598 F.3d 997, 1004 (8th Cir. 2010); United States v. Amburn, 412 F.3d 909, 915 (8th Cir. 2005). Agent Jackson testified that he needed to take additional steps other than just securing the cell phones and laptop computer to prevent loss of electronic evidence. He placed the phones first in a Faraday bag and then removed them from the Faraday bag and placed them in "airplane" mode. He stated that this mode keeps the phone from accessing any network, to keep it from being "wiped clean." The "airplane" mode also serves to conserve battery power. It is dangerous to let a cell phone die, because if it is password protected, the evidence might be difficult to recover. The laptop was likewise removed from the computer bag and plugged in. This is the current preferred forensic practice in order to save information on the laptop computer. Given the above law, the undersigned concludes that the agents were justified in doing this in order to preserve the evidence, and make sure it could be accessed

_____

a computer that very likely contained evidence of a crime. Further, the agents did not search the contents of the computer or any of the cell phones, but instead promptly obtained search warrants for all of the items. This lends further credence to the agent's testimony that the inventory was mot a mere ruse to search for incriminating evidence, but was a valid inventory search. Thus, the undersigned concludes that the search was lawful.

when the search warrant was obtained. The fact that a subsequent search warrant referred to phone numbers which had been identified by Special Agent Jackson when he was putting them in "airplane" mode does not affect any information found on the phone. Initially, the undersigned notes that, had Agent Jackson not obtained any phone numbers or identifying information, he still could have adequately described the four cell phones that were taken from the Defendant at the time of his arrest, and were then in the custody of the FBI and described the make and model of the cell phones from their outside. In addition, any information from powering up the cell phone would have been inevitably discovered after the warrant was issued. The cell phone was not searched in any manner, and only the number was obtained from the phone. Similarly, if phone number information is redacted from the subsequent search warrants, there remains more than sufficient probable cause supporting those warrants. See Swope, supra.

VI. Statement of the Defendant

The initial hearing on the motion to suppress statements was held on September 15, 2011. At the Defendant's request, a supplemental hearing was held on January 19, 2012, and the transcript of that hearing was filed on February 22, 2012. The evidence at the hearing revealed the following:

Shortly after the Defendant's arrest at the Quizno's, the Defendant was taken to the FBI office and interviewed by Agent Jackson and Task Force Agent Mize. Prior to the interview, the Defendant was completely advised of his rights by the agent from a form by reading each right to the Defendant, one at a time. The Defendant stated that he understood each right, and signed the form, stating he understood his rights and agreeing to talk to the agents. The agents interviewed the Defendant for approximately one half hour. No threats or promises were made to the Defendant at all during that time period. The agents described the Defendant as being very evasive in answering

any questions, and he made numerous attempts to try to determine from the agents exactly what evidence they gathered to use against him.

After about a half an hour of going back and forth with the Defendant, the agents determined that the interview would be non-productive and terminated the interview. The Defendant never stated that he wanted to stop talking to the agents, wanted to talk to an attorney, or wanted the interview stopped. The interview was terminated solely at the initiative of the agents. The Defendant was then taken to the booking area and processed. During the booking process, the Defendant, on numerous occasions, asked Agent Mize if he could speak to him alone. Finally, after about twenty minutes, Mize told the Defendant that he would talk to him, but not alone. The Defendant was then taken back to the interview room, and the interview was continued. During the second interview, the Defendant again asked numerous questions, over the agents' questions, in order to find out what evidence existed against him. At one point, he asked them if they had looked in the computer case, and they told him that they had found the computer and were going to obtain a warrant to search it. This was said to him in a matter-of-fact manner and not in an aggressive or threatening manner. In response to their statement about the computer, the Defendant said, "You have everything." At some point during the interview process, the Defendant asked for food because he had a stomach ache. The food was provided to him. After about twenty minutes, the Defendant continued to make equivocal admissions while still asking many questions of the agents. This second interview was also terminated. Again, the Defendant did not request that the interview stop, but the interview was terminated solely at the insistence of the agents. Again, during this interview, the Defendant was not threatened in any way, nor was he promised anything.

Based on the above, the undersigned concludes that the statement was voluntarily made after the Defendant was advised of his rights, and voluntarily and intelligently waived his rights. In order for a statement to be admissible, it must be "voluntary" and, further, a defendant's waiver of rights must both be "knowing and intelligent." See United States v. Turner, 157 F.3d 552 (8th Cir. 1998). Regarding custodial statements, the Eighth Circuit Court of Appeals has stated as follows:

> The appropriate test for determining voluntariness of a confession is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will. . .

United States v. Meirovitz, 918 F.2d 1376 (8th Cir. 1990).

In the present case, the Defendant was not threatened in any way nor was he promised anything in return for his statements. He was provided food and drink when he requested it. The Defendant told the agents that he was very knowledgeable of his rights and, in fact, during both interviews asked as many questions of the agents as they asked of him. Therefore , the undersigned concludes that the Defendant's will was not overborne and his statements were voluntarily made. In addition, even though the Defendant told the agents that he knew his rights, they, nevertheless, read them to him, he said he understood them, and he signed the waiver form. Therefore, the undersigned concludes that the statements were voluntarily made after he was fully advised of his rights, and intelligently waived his rights. See Miranda v. Arizona, 384 U.S. 436 (1966); North Carolina v. Butler, 441 U.S. 369 (1979); Colorado v. Connelly, 479 U.S. 157 (1986); Moran v. Burbine, 475 U.S. 412 (1985).

Further, the agents never misled the Defendant in any way. They told him that they had discovered the computer, and were going to obtain a warrant to search the computer. This is exactly what they intended to do and, in fact, what occurred. Further, it was not improper for the agents to

tell him they were going to search the computer, because, as stated above, it was lawfully seized and discovered. Therefore, the Defendant's statements should not be suppressed.

## Conclusion

Therefore, the Defendant's motion to suppress evidence and motion to suppress statements should be denied.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [Doc. #22] and Defendant's Motion to Suppress Physical Evidence [Doc. #23] be **denied**.

Further, the parties are advised that they have fourteen (14) days, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this  13th  day of March, 2012.